UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

**TAMMY W.,**

**Plaintiff,**

    v.

**COMMISSIONER OF SOCIAL
SECURITY,**

**Defendant**.

Case No. 1:21-cv-00959-TPK

OPINION AND ORDER

## OPINION AND ORDER

      Plaintiff filed this action under 42 U.S.C. §405(g) asking this Court to review a final decision of the Commissioner of Social Security.  That final decision, issued by the Appeals Council on June 30, 2021, denied Plaintiff's application for supplemental security income.  Plaintiff has now moved for judgment on the pleadings (Doc. 8), and the Commissioner has filed a similar motion (Doc. 9).  For the following reasons, the Court will **GRANT** Plaintiff's motion for judgment on the pleadings, **DENY** the Commissioner's motion, and **REMAND** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four**.**

### I.  BACKGROUND

      Plaintiff filed her application for benefits on December 10, 2018, alleging that she became disabled on June 24, 2016.  After initial administrative denials of that claim, a hearing was held before an Administrative Law Judge on September 1, 2020.  Plaintiff and a vocational expert, Kenneth Smith, testified at the hearing.

      The Administrative Law Judge issued an unfavorable decision on January 29, 2021.  He first found that Plaintiff had not engaged in substantial gainful activity since her application date.  Next, he concluded that Plaintiff suffered from severe impairments including postural orthostatic tachycardia syndrome, asthma, migraines, obstructive sleep apnea, and lower extremity venous insufficiency.  However, the ALJ determined that these impairments, taken singly or in combination, did not meet the criteria for disability under the Listing of Impairments.

      Moving forward with the sequential evaluation process, the ALJ then concluded that Plaintiff had the ability to perform a limited range of sedentary work.  She could occasionally use her lower extremities for foot control operation but could never climb ladders, ropes, or scaffolds.  She also had to avoid concentrated and frequent exposure to extremes of temperature and bronchial irritants and needed to avoid all exposure to flashing or strobing lights, noise above 65 decibels, and vibration.  Lastly, she had to avoid all exposure to dangerous moving machinery

and unprotected heights and would incur one unscheduled absence per month.

The ALJ further concluded that Plaintiff had no past relevant work. However, relying on the vocational expert's testimony, the ALJ determined that, given her vocational profile and with the limitations described above, Plaintiff could perform certain sedentary jobs such as addressing clerk, document preparer, and touch-up screener. He also found that these jobs existed in significant numbers in the national economy. As a result, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.

Plaintiff, in her motion for judgment on the pleadings, raises two issues, stated as follows: (1) "Were the ALJ's supportability and consistency evaluations for multiple opinions flawed warranting remand?"; and (2) "Did the ALJ fail to reconcile obvious conflicts between his RFC finding and the vocational testimony concerning absenteeism during the probationary period?" *See* Plaintiff's Memorandum, Doc. 8-1, at 1.

## II.  THE KEY EVIDENCE

### A.  Hearing Testimony

Plaintiff, who was 36 years old at the time of the administrative hearing, first testified that she had completed the eighth grade in school and had not gotten a GED. She was not working at that time, and had tried unsuccessfully to work in the prior year, leaving jobs after a short time due to problems such as anxiety, swelling of her legs, or inability to deal with cold temperatures.

When asked about the reasons she could not work, Plaintiff said that she had pain in her ankles, feet, and hips, and that she also experienced numbness in her feet if she sat for too long. Standing in one spot was also problematic, and she had balance problems which affected her ability to walk. Climbing a flight of stairs made her short of breath. She could lift a gallon of milk occasionally but not all day long. Plaintiff also said that her migraine medication caused numbness in her hands and that she used a rescue inhaler on a daily basis to treat her asthma. She still experienced migraine headaches five or six times per month despite taking her medication, and those could last three or four days. She needed help doing household chores as well but was able to take care of her personal needs. Lastly, Plaintiff said that she suffered from both anxiety and depression and that they affected her ability to deal with others.

The vocational expert, Kenneth Smith, after being advised that Plaintiff had no past relevant work, was asked questions about a person with Plaintiff's vocational profile who was limited to light work with various postural and environmental restrictions and who would average one unscheduled absence every 60 days. In response, he testified that such a person could do a number of light unskilled jobs. He was then asked to assume that the person was limited to sedentary work and would incur one unscheduled absence per month. Mr. Smith testified that with these restrictions, the person could still do jobs such as addressing clerk, document preparer, and touch-up screener, and he gave numbers for those jobs as they existed in

the national economy. Finally, he testified that elevating one's feet ten or twelve inches off the ground was inconsistent with the ability to do any of those jobs, and that missing a day of work in the first 30 days would also be work-preclusive.

### B.  Treatment Records

The pertinent medical treatment records show the following. Plaintiff was seen by Dr. Sfintescu in September, 2018, for treatment of fatigue. Her problem list at that time included multiple conditions including peripheral vascular disease, chronic obstructive lung disease, mild intermittent asthma, and migraines. Previously, she had been treated for venous insufficiency in her legs which was causing her to experience calf pain while walking. At that time, she denied any other musculoskeletal symptoms, and compression stockings were prescribed. Daily exercise was also recommended. At a 2018 follow-up visit, Plaintiff also reported tingling and numbness in her hands and feet, but she said she could still carry out her activities of daily living without difficulty.

In May, 2018, Plaintiff was seen at Orchard Family Practice, where she had been a patient for several years, for evaluation of her mental status. She said that she was doing well, was not taking any medications for psychological conditions, and felt she had been wrongly diagnosed with anxiety and depression, although she reported those diagnoses to a medical provider in February of that year. She also said her headaches were infrequent. She continued to deny psychological symptoms at a follow-up visit in June, but in September she said she was having daily migraines and was started on Topamax, which appeared to help. In April of 2019, she was treated with trigger point injections in an attempt to control her migraines, which had recently gotten worse. She received such injections on a monthly basis for the remainder of that year and again in 2020.

### C.  Opinion Evidence

On January 25, 2019, Plaintiff saw Dr. Liu for a consultative internal medicine exam. She reported a history of postural orthostatic tachycardia syndrome which caused her some dizziness, pain in her lower back resulting from a fall in 2015, and some difficulty with prolonged sitting and walking as well as symptoms of asthma. She described fairly normal activities of daily living including cooking, housecleaning, laundry, and shopping. On examination, Plaintiff could walk on her heels and toes with mild difficulty and was limited in her ability to squat. She had some restrictions on the range of motion of her lumbar spine but straight leg raising was negative bilaterally. Her hand and finger dexterity were intact and her grip strength was normal. Dr. Liu thought Plaintiff was mildly limited in her ability to engage in prolonged walking, bending, kneeling, squatting, stair climbing, carrying heavy weights, sitting, and standing, might experience an interruption in activities due to migraines, and should avoid environmental irritants and workplace hazards. (Tr. 549-53).

Plaintiff also underwent a consultative psychiatric examination on that day, performed by

Dr. Ransom. Plaintiff told Dr. Ransom that she had received outpatient mental health treatment for anxiety but stopped treatment because her problems were related to a heart condition. She denied experiencing any mental health symptoms and said she could perform all activities of daily living including light cooking, cleaning, laundry, and shopping. Dr. Ransom concluded that Plaintiff did not have a diagnosable psychiatric condition. (Tr. 556-59).

Plaintiff's cardiologist, Dr. Horn, completed a form on August 17, 2020, indicating that Plaintiff did not have any restrictions from a cardiac standpoint. He deferred any evaluation of restrictions due to her vascular disease to the physician treating that disorder, Dr. Frost. However, he also said that she needed to elevate her legs frequently and that she could sit for only four hours at a time. (Tr. 803-04).

Julia Stoerr, a physician's assistant, also completed a form on which she evaluated the functional limitations caused by Plaintiff's headaches. She noted that Plaintiff suffered from headaches three to four times per week but that her condition was mild to moderate in severity if Plaintiff followed her treatment regime. The headaches could be triggered by bright lights or noise and while they were present Plaintiff could not work. Plaintiff would also have to take one or two unscheduled breaks per month that would last for up to eight hours and would miss work about twice per month. (Tr. 1021-26).

Another of Plaintiff's treating sources from Orchard Park Family Practices evaluated Plaintiff's functional capacity based on her multiple diagnoses. According to that evaluation, Plaintiff suffered from chronic fatigue and edema which caused sleep disturbance and decreased energy. She could walk 2-3 blocks, sit for up to four hours at a time, stand for up to four hours at a time, would have to take unscheduled work breaks, could occasionally twist, stoop, crouch, and climb, would be off task for 15% of the time, and would miss three days of work per month. (Tr. 1029-34).

Finally, two state agency reviewers expressed opinions concerning Plaintiff's functionality. Dr. Ehlert concluded that she could do light work with some environmental restrictions, and Dr. Koenig concurred.

### III.  STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings

of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").

Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation marks omitted and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012).

## IV. DISCUSSION

In her first claim of error, Plaintiff asserts that the ALJ erred in his evaluation of the expert opinions by failing to apply correctly the standards of consistency and supportability which are set out in the controlling regulation, 20 C.F.R. §416.920c. More particularly, she contends that the ALJ improperly disregarded, without explanation, the limitation expressed by Dr. Horn that Plaintiff keep her feet elevated on a frequent basis during an eight-hour work day, which limitation was also expressed by Plaintiff's treating doctor. She also faults the ALJ's evaluation of physician's assistant Stoerr's opinion that Plaintiff would miss more than one day of work per month. Lastly, she asserts that the ALJ appeared to find multiple opinions equally persuasive based on supportability and consistency but failed to apply additional factors to determine how much weight to give to each one. The Commissioner responds that the ALJ fully explained his evaluation of each opinion and had valid reasons for the weight assigned to each.

The ALJ explained his weighing of the expert opinions in this way. After making the following observation about what the testimony and treatment records showed, which was that "[t]he claimant's severe physical impairments have been routinely treated with medication management [and that] [a]ll of her physical impairments have been under control and did not debilitate the claimant such that she could not perform some work activities on a regular basis," Tr. 21-22, the ALJ first concluded that "Dr. Horn's opinion is partly persuasive because he opines the claimant is not disabled and would be capable of performing work activities." (Tr. 22). The ALJ noted, however, that Dr. Horn evaluated Plaintiff only from a cardiac point of view and that other evidence indicated she could not lift up to 50 pounds, as Dr. Horn believed she could. He also pointed out that Dr. Horn did not undertake a complete evaluation of Plaintiff's capabilities, and reasoned "that the claimant does not have a cardiac disability that

precludes her ability to work." *Id.*

Next, the ALJ discussed Ms. Stoerr's opinion, weighing it as follows:

> Physician Assistant Stoerr's opinion is somewhat persuasive with respect to the claimant's migraines. The PA stated the claimant's migraines were mild to moderate in severity and were well managed with medications. This is reflected by the medical evidence of record, including the most recent treatment records in 2020. She stated the claimant retained the capacity to work on a sustained basis, but may have several instances per month where her migraines would interfere with her ability to work. The claimant reported that she was doing well on medications for migraines and would soon undergo Botox injections for additional treatment. Accordingly, PA Stoerr's opinion establishes that despite her migraine diagnosis, the claimant has retained the ability to perform work activities with the appropriate accommodations.

*Id*. With regard to the Orchard Park Family Practice Opinion, the ALJ found that this evaluation of Plaintiff's mental and physical capabilities was consistent with his residual functional capacity finding, but the ALJ found it less than persuasive as to Plaintiff's work attendance "because I do not see a basis for concluding the claimant would be off task for 15% of the workday or miss work three days per month." *Id*. Finally, the ALJ determined that the consultative and reviewing physicians' opinions were partially persuasive but that each of them overstated Plaintiff's ability to perform work-related functions.

The first specific claim raised by Plaintiff's memorandum is that the ALJ never explained why he disregarded Dr. Horn's statement that Plaintiff needed frequently to elevate her legs. It is true, as the Commissioner points out, that Dr. Horn's opinion is not a model of clarity. In the comments portion of the form, he stated that Plaintiff had "no restrictions from a cardiac standpoint" and that he deferred to Dr. Frost, who treated Plaintiff for her vascular issues, as to restrictions caused by that condition. (Tr. 804). At the same time, however, he indicated several restrictions on the form, including an inability to lift more than 20 pounds frequently, a limitation to sitting for no more than four hours at a time, and, perhaps most significantly, the need for her to elevate her legs frequently during an eight-hour workday (the other choices on the form were "none," "occasionally," and "most of time"). The Commissioner argues that the ALJ was entitled to disregard this last limitation based on the fact that it seems to contradict Dr. Horn's disclaimer that Plaintiff had no restrictions from a cardiac standpoint; that any need to elevate her legs stemmed from Plaintiff's peripheral vascular disease and restless leg syndrome, which impairments fell outside the scope of Dr. Horn's opinion; that the use of the term "frequently" was not likely meant to mirror the meaning of that term as it is defined in social security regulations; and that Dr. Horn did not indicate how high Plaintiff's legs needed to be elevated, which has an impact on whether that restriction is incompatible with sedentary work.

All of the Commissioner's observations, with the possible exception of the meaning of

the term "frequently" as used on the form completed by Dr. Horn, are fairly accurate. However, none of them appear in the ALJ's decision. As this Court has often said, "it is well settled that *post hoc* rationalizations are not an appropriate substitute for an ALJ's duty to support her conclusions by reference to substantial evidence." *Thomas v. Colvin*, 302 F. Supp. 3d 506, 511 (W.D.N.Y. 2018). While an ALJ may discount a medical opinion on grounds of vagueness and need not necessarily seek clarification of that opinion, *see, e.g., Alexander v. Comm'r of Social Security*, 2020 WL 5642184 (Sept. 22, 2020), it is impossible to know in this case if that was the ALJ's rationale due to his failure to acknowledge or discuss the leg-raising limitation found in Dr. Horn's opinion. This error alone requires a remand.

The Court also finds that the ALJ's treatment of PA Stoerr's opinion contains a possible error. As noted above, the ALJ concluded that the report itself "establishes that despite her migraine diagnosis, the claimant has retained the ability to perform work activities with the appropriate accommodations." But it actually does not. Ms. Stoerr specifically stated that, due to her migraine headaches, Plaintiff would be absent from work "about twice a month...." (Tr. 1025). That limitation was in addition to Plaintiff's need to take one or two unscheduled breaks of two to three (and possibly up to eight) hours in duration every month. It is a fair inference from the vocational testimony that these restrictions, taken together, would be work-preclusive, but the ALJ apparently failed to recognize the extent to which Ms. Stoerr's opinion limited Plaintiff's workplace attendance. To the extent that the ALJ believed that Plaintiff's condition had improved to the point where these restrictions were no longer supported by the record, that, again, was not stated with any degree of specificity or with citations to portions of the record which might substantiate such a conclusion. On remand, this matter also would benefit from further explanation.

Plaintiff's other claims of error require little additional discussion. The remand being ordered will essentially moot the third prong of her argument concerning the medical opinions, and remand will also give the ALJ an opportunity to explore in greater depth any apparent inconsistency between the ALJ's residual functional capacity finding and the vocational expert's testimony about the impact of absenteeism on an employee's ability satisfactorily to complete a probationary work period - and, in particular, whether the Commissioner's argument that there is a difference between unscheduled and unexcused absences is a correct interpretation of that testimony.

## V.  CONCLUSION AND ORDER

For the reasons stated above, the Court **GRANTS** Plaintiff's motion for judgment on the pleadings (Doc. 8), **DENIES** the Commissioner's motion (Doc. 9), and **REMANDS** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

/s/ Terence P. Kemp
**United States Magistrate Judge**